# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Michael A. Hammer |
| v. | : | Magistrate. No. 25-10127 (MAH) |
| RYAN L. TERRY | : | **CRIMINAL COMPLAINT** |
| | : | Filed Under Seal |

I, Alexis Howell, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Alexis Howell, Special Agent
Federal Bureau of Investigation

*Special Agent Howell attested to this Affidavit by telephone pursuant to FRCP 4.1(b)(2)(A) on April 30, 2025*

S/ Michael A. Hammer
_____
Honorable Michael A. Hammer
United States Magistrate Judge

## **ATTACHMENT A**

### **Count 1**
(Conspiracy to Commit Bank Fraud)

From in or about June 2023 through in or about December 2023, in Essex, Bergen and Hudson Counties, in the District of New Jersey, and elsewhere, defendant

**RYAN L. TERRY**

knowingly and intentionally conspired with others to execute a scheme and artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain monies, funds, assets, and other property owned by and under the custody and control of such financial institution, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

- 2 -

## Count 2
(Bank Fraud)

On or about July 21, 2023, in Hudson County, in the District of New Jersey, and elsewhere, defendant

**RYAN L. TERRY**

knowingly and intentionally executed, or attempted to execute, a scheme or artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation, and to obtain any of the monies, funds, assets, and other property owned by and under the custody and control of such financial institution, by means of materially false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Section 1344 and Section 2.

## **ATTACHMENT B**

I, Alexis Howell, a Special Agent of the Federal Bureau of Investigation ("FBI"), have knowledge of the following facts based upon my personal knowledge and discussions with other law enforcement officers, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including photographs, videos, business records, bank records, and other documents. Because this Criminal Complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation; rather, I have only set forth those facts that I believe are sufficient to show that probable cause exists to believe that the defendant has committed the offense set forth in Attachment A. The contents of documents and the statements and conversations of individuals referenced below are provided in substance and in part, unless otherwise indicated. Where I assert that an event took place on a particular date and time, I am asserting that it took place on or about the date and time alleged. Dollar amounts, and other figures cited herein are approximations.

## **Background**

1. At all times relevant to this Criminal Complaint:

   a. Defendant RYAN TERRY ("TERRY") was a resident of Piscataway, New Jersey. TERRY was a police officer with the Orange Police Department and is currently employed as a police officer with the Essex County Sheriff's Department.

   b. Co-Conspirator 1 ("CC-1") deposited stolen checks into bank accounts controlled by TERRY and/or other members of the conspiracy.

   c. The bank accounts of Co-Conspirator 2 ("CC-2") were used to facilitate the scheme to defraud.

   d. Co-Conspirator 3 ("CC-3") provided transportation to other members of the conspiracy to various financial and government institutions to facilitate the scheme to defraud.

   e. Co-Conspirator 4 ("CC-4") was employed at Bank-1 and provided insider access to the bank accounts CC-2 maintained at Bank-1.

   f. The United States Postal Service ("USPS") provided mail processing and delivery services to individuals and businesses in the United States.

g. Bank-1, Bank-2 and Bank-3 (i) were "financial institution(s)" as that term is defined in Title 18, United States Code, Section 20, offering, among other things, checking and savings accounts to customers, (ii) had deposits insured by the Federal Deposit Insurance Corporation and/or accounts insured by the National Credit Union Insurance Fund, and (iii) had branches in New Jersey.

### Overview of the Conspiracy

2. An investigation by law enforcement revealed that from in or about June 2023 through in or about December 2023, TERRY and Co-Conspirators 1-4 participated in a scheme to fraudulently obtain funds from Bank-1 using checks stolen from the U.S. mail.

3. It was the goal of the conspiracy for TERRY and Co-Conspirators 1-4 to enrich themselves by arranging for the deposit of stolen checks to fraudulently obtain money from Bank-1.

### Theft of Checks and Scheme to Obtain Funds from Stolen Checks

4. TERRY and CC-1 deposited or caused to be deposited checks stolen from the U.S. mail into accounts at Bank-1 maintained in the name of a CC-2 who, prior to the deposits, provided his/her banking information to TERRY.

5. To fraudulently obtain funds from Bank-1, TERRY, Co-Conspirators 1-4, and others then withdrew or caused others to withdraw money from CC-2's accounts through either cash withdrawals, the purchase of money orders at the USPS, or transfers to other bank accounts.

6. Communications involving TERRY and Co-Conspirators 1-2 were obtained by and reviewed by law enforcement. These communications chronicled the steps the co-conspirators took to execute the scheme, including the acquisition of the CC-2's banking information, the deposit of stolen checks, and the coordination of cash withdrawals.

7. Communications from TERRY also revealed TERRY's efforts or attempts to insulate himself from any criminal exposure by directing CC-2 to delete text messages after those messages were transmitted and read.

*The First Stolen Check*

8. On or about July 28, 2023, Individual-1 reported to the New Jersey State Police on behalf of Company-1 that a check in the amount of $50,336.08 (the "First Stolen Check") was not received or deposited by the intended payee. Instead, records from Bank-1 showed that on or about July 12, 2023, the First Stolen Check had been deposited into the checking account of an unknown

individual, who was later identified as CC-2. According to Individual-1, the First Stolen Check was written and sent through the U.S. mail on or about June 29, 2023.

9. Based on law enforcement's review of video footage from Bank-1, CC-1 deposited the First Stolen Check on July 12, 2023, into the account of CC-2 at an Automated Teller Machine ("ATM") located in Rutherford, New Jersey.

10. On or about July 21, 2023, Co-Conspirators 1-4, conducted the following transactions to nearly deplete in full the amount of the First Stolen Check from CC-2's account:

    a. CC-2 made an in-person withdrawal at a bank branch in Jersey City in the amount of $25,000 facilitated by CC-4;

    b. CC-2 made an in-person withdrawal at an ATM in the amount of $8,900;

    c. CC-1 and CC-3 made an in-person withdrawal at an ATM in the amount of $3,000;

    d. CC-1 and CC-3 made an in-person withdrawal at an ATM in the amount of $1,000;

    e. CC-1 made an in-person purchase of a money order at a post office in the amount of $2,507.80;

    f. CC-3 made an in-person purchase of a money order at a post office in the amount of $2,407.80;

    g. CC-2 electronically transferred $5,000 to TERRY's account at Bank-2 through Zelle[1] by directing payment to TERRY's cell phone number in which TERRY is identified as the listed subscriber; and

    h. CC-2 electronically transferred $2,000 from another one of his/her accounts at a different bank to CC-1 through Zelle by directing payment to CC-1's email address.

---

[1] Zelle is a United States–based digital payments network that allows customers to send money directly between almost any United States bank accounts, typically within minutes, with just an email address or U.S. mobile phone number.

*Text Messages about the First Stolen Check*

11. One day after the First Stolen Check was mailed, TERRY texted CC-2 on or about June 30, 2023, and asked for CC-2's banking information, including the address on the account, pin number, username, password, security question answers, and date of birth. CC-2 responded to TERRY and provided the requested information.

12. On or about July 19, 2023, TERRY texted CC-2, asking CC-2 to "send a screen shot" of a mobile deposit that was made into CC-2's account. TERRY also instructed CC-2 to "delete these messages" after CC-2 sent the screenshot.

13. On or about July 20, 2023—i.e., the night before the withdrawals, purchases, and transfers described above—TERRY texted CC-2 the following messages:

| Approximate Date and Time | Message |
|---|---|
| July 20 – 8:43 p.m. | I need you to be free tomorrow baby |
| July 20 – 8:43 p.m. | I'll call you tonight to give you the run down |
| July 20 – 8:43 p.m. | Cause tomorrow is the day |
| July 20 – 8:56 p.m. | Feel me this test then focus on this money |
| July 20 – 9:51 p.m. | Ok ima call you in a min |

14. In the early morning hours on or about July 21, 2023—i.e., the day of the withdrawals, purchases, and transfers described above—CC-1 texted CC-2 at 12:39 a.m.: "Hey will be to u around 820 am can u send the address & screen shot of the mobile when it clear." At nearly the same time, at 12:39 a.m., TERRY texted CC-2 twice, saying "My cousin texted you" and "Respond."

15. At approximately 5:56 a.m. on the morning of July 21, 2023, CC-1 texted CC-2: "Log in go to mobile deposit it s [sic] going [sic] say choose a [sic] account just send a screenshot." In response, CC-2 sent CC-1 the following screenshot showing an account balance of $50,406.44:



16. Later that same morning, CC-1 texted CC-2 the plan for that day:

| Approximate Date and Time | Message |
| --- | --- |
| July 21 – 6:03 a.m. | We going to the plug |
| July 21 – 6:03 a.m. | So please be up round early 8ish |
| July 21 – 7:23 a.m. | Dress like you going to a [sic] interview |
| July 21 – 7:45 a.m. | Send address |

Based on my training and experience, CC-1's reference to "plug" meant a location where they would commit the fraud. After CC-2 provided his/her address to CC-1 by text, CC-1 texted CC-2 at 8:45 a.m. to "Come out."

17. At approximately 1:25 p.m. that same day, CC-1 and CC-2 exchanged the following text messages:

| Sender | Message |
| --- | --- |
| CC-1 | Update? |
| CC- 2 | [unreadable image] |
| CC- 1 | Okay |
| CC- 1 | Went over limit |
| CC- 2 | You going to be around later |

- 7 -

| CC-1 | Loved "you going to be around later" |
| CC-1 | Yeah |
| CC-2 | I can get it from my other and give you it |
| CC-1 | U transfer it to there |
| CC-1 | ? |
| CC-2 | Or I can send it to him to give to you |
| CC-1 | Send it there |
| CC-1 | I'll come grab from u |
| CC-1 | Or zelle |
| CC-1 | Xxxxxxxxxxx##@yahoo.com |
| CC-1 | That's my zelle |
| CC-2 | Ok |
| CC-2 | Done |

As described above, CC-2 sent $2,000 from an account at Bank-3 to CC-1 through Zelle by directing payment to Xxxxxxxxxxx##@yahoo.com, which is the email address CC-1 provided to CC-2.

18.   Later in the afternoon of July 21, 2023, TERRY and CC-1 exchanged a series of telephone calls as depicted in the chart below:

| Call Initiated By | Call Received By | Call Initiation Time | Call Termination Time | Duration |
| --- | --- | --- | --- | --- |
| CC-1 | TERRY | 14:54:09 | 14:54:09 | 0:00 |
| CC-1 | TERRY | 15:24:12 | 15:25:18 | 1:06 |
| TERRY | CC-1 | 15:44:20 | 15:45:53 | 1:33 |
| TERRY | CC-1 | 16:21:13 | 16:21:18 | 0:05 |
| TERRY | CC-1 | 16:32:52 | 16:34:10 | 1:18 |
| CC-1 | TERRY | 18:00:32 | 18:00:32 | 0:00 |

*The Second Stolen Check*

19.   Later in July 2023, Company-1 mailed a second check in the amount of $20,336.08 (the "Second Stolen Check") that was not received or deposited by the intended payee. Instead, records from Bank-1 showed that on or about July 24, 2023, the Second Stolen Check had been deposited into another account in the name of CC-2. This transaction was ultimately reversed by Bank-1 before funds could be withdrawn from the account.

20.   On or about July 24, 2023—i.e., the date the Second Stolen Check was deposited—TERRY texted CC-2 at approximately 8:30 p.m., asking CC-2 to send TERRY "a screen shot of your ac." Based on my training and experience,

the reference to "ac" meant "account." At the same time, TERRY also instructed CC-2 to "delete this message."

21. At approximately 9:08 p.m. that same night, TERRY texted CC-2: "Send me a pic of chck [sic] images that were dropped then delete this message." TERRY then sent the following instructions:

| Approximate Date and Time | Message |
|---|---|
| July 24 – 9:30 p.m. | Log in |
| July 24 – 9:31 p.m. | Click the account and scroll down |
| July 24 – 9:31 p.m. | And hit view check of the old one my bad |
| July 24 – 9:31 p.m. | Send the images of the old check my bad |
| July 24 – 9:32 p.m. | Only the front |
| July 24 – 9:33 p.m. | Delete it all out the thread when you done |

*Recruitment*

22. On multiple occasions, TERRY requested that CC-2 recruit other individuals to engage in similar fraudulent activity, as shown by the following text messages on the approximate dates listed:

| 8/8/2023 | |
|---|---|
| Sender | Message |
| TERRY | But look I need to make another play |
| TERRY | Might wanna ask that girl if she wanna do it |
| TERRY | I need another 5k |

| 8/15/23 | |
|---|---|
| Sender | Message |
| TERRY | But I need one more play fr |
| TERRY | Big play |
| CC-2 | You never said what you wanted to do with that other card |
| TERRY | Can't make that move no more need another joint |
| CC-2 | Okay |
| TERRY | What about your nail tech |
| CC-2 | I don't see her until 8/31. I don't have her number. imma ask my other girlfriend today if she know someone that's interested |
| TERRY | Bet |

23. On or about August 16, 2023, the day after he inquired about the nail tech, TERRY texted CC-2 a request seeking the banking information of

- 9 -

Female-1, including her name, address on the account, pin, online username, password, security questions and answers, and social security number.

24. On or about August 17, 2023, CC-2 texted TERRY the banking information for Female-1.

25. On or about November 30, 2023, TERRY texted CC-2 at approximately 7:56 a.m.: "I'ma [sic] give my cousin your number he's gonna contact you to get in contact with her have her just cooperate please I'm about to Ko." Later that morning at approximately 11:53 a.m., TERRY texted CC-2, stating "That's him calling" and "Pick up for him." According to cellular phone records, CC-1's cellular phone called CC-2 at approximately 11:51 a.m.

26. Later that afternoon, on or about November 30, 2023, at approximately 1:28 p.m., CC-1 texted CC-2, "Rose land," "156 eagle rock road," and "Be there 230." Bank-3 operates a branch at 156 Eagle Rock Avenue in Roseland, New Jersey.

27. On or about November 30, 2023, at approximately 1:29 p.m., CC-2 then texted Female-1 "156 eagle rock road, Roseland".

28. According to the information provided by or Bank-1, the fraudulent transactions made with the aforementioned stolen checks by TERRY and his co-conspirators resulted in financial losses to the banks.